# CRIMINAL RECORDER.

## JULY TERM, 1815.

In the matter of the Sheriff and Jailor of the City and County of New York on the complaint of Wm. W. M'Clelan, Gentleman, one, &c.

The facts and arguments of this case are amply detailed in the following decision.

*Riker, Recorder.* THIS Court is now called upon to decide a question of no ordinary magnitude and importance. In *form*, it is a contest between a member of the bar and two public officers. In *substance*, it involves the right of suitors; and in its bearings implicates the interests of all men, whom crime, misfortune, or oppression, may consign to the walls of a prison. For a more distinct understanding of the merits of the controversy, it is proper to state, that one Zenos Meigs Bradley is, and has been for several months, a prisoner in actual confinement for debt, within the jail of this city, upon process issued out of this Court. He wrote a note to Mr. M'Clelan, requesting his professional assistance, in which he desired he would call and see him. Mr. M'Clelan called at the jail on the morning of the 22d of June, between the hours of 11 and 12. The turnkey refused to let him in. This call he repeated the same morning, and was again denied admittance. On both occasions he explained his object that it was to see his client, Mr. Bradley. One of the turn-

NEW YORK, July, 1815.

A Counsel has a right, at all reasonable hours of the day, to go within the walls of a prison for the purpose of advising with his client. He cannot be denied this right by any sheriff, jailor, or turnkey. If he is denied admittance, redress may be had by the summary means of attachment, and he is not driven to an action of trespass.

NEW YORK, keys informed him that Mr. Bell, the jailer, had given
July, 1815. them orders not to admit him; and therefore he must ap-
ply to Mr. Bell.   This he did on the same day, but with-
out effect ; and he afterwards, and on the  same  day, ap-
plied to the sheriff, who said he would inquire of the jailer
into the cause.   The inquiry being made, and the officers
persisting in excluding Mr. M'Clelan from entering the
prison, he has applied to this Court, for an order for his
admission, and thus the question has arisen upon which a
determination is now to be made.

1t is urged as a *general* principle, on the part of the
sheriff and jailer that the admission of a counsel within
the jail to confer with his client, who may be confined
therein, is a matter of *indulgence,* and not of right; and
consequently, that the jailer may, in his discretion, give
or refuse admission.   In support of this general principle,
it is urged on the part of the officers, that they are liable
for all escapes, no matter from what cause, unless it be
by means of a public enemy.   This is no doubt the law.
It is hard, it is said, to expose them to utter ruin by com-
pelling them to open daily the doors of the jail to coun-
sel.   That if this be decided to be the law, no prudent
man will take upon himself the execution of the office of
sheriff or jailer.   That it will be impossible to find sureties
—that escapes will be inevitable : and it is insisted, that
a train of evils will follow, the extent of which no man
can foresee ; all of which will be averted, if it be left to
the discretion of the jailer to grant, or refuse admission, as
he shall think proper.   It hath also been urged by the
officers, that this Court hath not the power the interfere
in the summary manner proposed.   But if they have in-
fringed either the right of the counsel, or the privilege of

the client that redress can be afforded only by a suit in NEW YORK, the ordinary course of law. And lastly, it is contended July, 1815. that the facts disclosed in the deposition of the late sheriff, Simon Fleet, Esquire, the present sheriff, and the jailer, furnish sufficient reasons against this Court interfering, even if the right to interfere existed.

On the other side it is urged as a general principle, that it is the right of every man to have the benefit of counsel—that it is a privilege secured even to criminals, by the express provisions of our Constitution ; and consequently, that a person confined in prison cannot go to his counsel, it follows by the most obvious dictates of common sense, that his counsel must have, of right admission to him. It is urged in support of this general principle, that uniform usage and practice show what the law is. That no case or precedent can be found in the books, of a jailer refusing to admit the counsel of a prisoner. That to allow of such a thing, would be to subject one of the most invaluable rights of an American citizen to the caprice of the keeper of a public prison. That it is an authority which the law has given to no magistrate whatsoever, and is an unnecessary delegation of power. That in the hands of the jailer, it might be exercised to the worst and the basest of purposes. That such a power has in itself all the marks and character of despotism. It may be exercised in secret. It may be indulged to gratify private revenge. It is irresponsible, without check or control. It is also urged by the counsel of Mr. M'Clelan, that the danger of escape is idle and illusory. That it cannot be believed, that a counsel going into the jail at seasonable hours of the day to see a client would jeopardize its safety or diminish its security. That it ought

NEW YORK,
July, 1815.

not to be believed, on light grounds, that any counsel would act so unworthy a part as to aid the escape of a prisoner. That the accusation ought to be supported by *facts* and not by *surmises.* That this Court has a right to see that its process be not abused; and, therefore, that it ought to interfere to restrain the oppression complained of.

I have listened attentively to the arguments on both sides. I have given to the subject all the reflection that its importance demanded. I hope, and believe, that I have not been unmindful of the duties, the power, and the risks of the sheriff and jailer, on the one hand nor of the privilege of counsel, or the right of the prisoner, on the other ; nor has it escaped me that the decision I make this day may be drawn into precedent hereafter. That the rule which is established in reference to Mr. M'Clelan, will be the law with regard to every member of the bar. The limitation also, which I now set to the rights of Zenos Meigs Bradley, will be set to the rights of every man, whose faults, or misfortunes, may subject to the process of this Court. I have considered too, that the same power which a jailer may exercise over a *debtor,* may be exercised over a man accused of a *crime.* If counsel can be excluded in the one case, they may be in the other. Acting under the influence of all these serious impressions, the Court will now proceed to deliver its judgment upon the three following questions :

1. Has a counsel a right by law, at seasonable hours of the day, to go within the walls of a jail for the purpose of advising with his client?

2. If such right exists, can it be enforced by summary means, or is the party injured driven to his action?

3. If it can be enforced by attachment, do the deposi- NEW-YORK, tions which have been produced on the part of the sheriff July, 1815. and jailer warrant the Court in refusing to interpose?

It is here proper to premise, that when we speak of a right or privilege of counsel, we mean the right and privilege of the client. It is the sacred right of every man to be heard in his defence, to keep his own secrets, to confront his accusers, to impeach the testimony of those who come to destroy him. But as all men are not equally competent, the law allows of advocates. These advocates, whilst representing their clients, possess the privileges of their clients. But the privilege of the lawyer is, in fact the privilege of the client——and hence it hath been solemnly adjudged, that if a member of the bar should be so base as to reveal the secrets of his client, the Court would not permit him to do it. With this explanation, that what is usually termed, and what I may hereafter call the privilege of a counsel, is in strictness the privilege of the suitors. The keeping of the jail being confided to the Jailer, an opinion prevails that he may keep it as a man keeps his own house ; that he is absolute there, and may exclude whom he pleases ; in fact, that the jail, for the time being is his. This is a gross error, and has led to many of the false conclusions that hath been drawn. All the books show that a jail is of such *public consequence*, that it cannot be erected by any authority except the legislature, and that it belongs to the State. Lord Coke says, " Jails are of such universal concern to the public, that none can be erected by any less authority than an act of parliament." 2 Just. 100. et vide 3 Bac. Abr. 345. title jail, and jailer, Let. A.

The sheriff or his jailer is merely the keeper. The

jail belongs to the State.    Hence in the writ of Hab. Cor. the sheriff, or other keeper of prisoners, are commanded " to have the body of A. B. detained under your custody." The whole course of judicial proceedings show the same thing.    Nor is it true, that the jailer is absolute, and has a right to exclude whom he pleases.    At common law, it is doubtful whether the jailer is bound to provide his prisoner with food.    3 Bac., title, jail and jailer.    Let. F., p. 355.    The better opinion is that he is not.    Plow. 68. 2 Rolls. Abr. 32.

The statute of our State, declaring the duties of sheriff, says expressly, " that every person who shall be commit- " ted to the custody of the sheriff, or other officer, in exe- " cution of any debt or damages, shall safely be kept in " prison, in close and secure custody without bail, living at " *his or her own costs.*    1. vol. Rev. Laws, p. 425,  § 19." Hence the legislature has provided in the same act, § 16. p. ibid., "that every sheriff, or other officer, or person, " having the custody of any prisoner, shall permit him, at " his own will and pleasure, to send for and have any " beer, ale, victuals, and other necessary food, where and " from whom any such prisoner pleases."

By the act relative to jails, it is also provided that the Mayor of this City may appoint one or more physicians, who may grant permits in writing to any person in jail, to use spiritous liquors if his health requires it.    1 vol. Rev. Laws, p. 433, § 34.    Now it is clear, beyond all doubt, that the friend of a prisoner, confined in jail, might at the common law, and may under our statute enter the jail at seasonable hours of the day, to bring him food.    A physician who is appointed for that pur- pose by the Mayor, may visit a sick prisoner, and the

physician's permit in written, will, I conceive, authorize NEW-YORK, July, 1815. a person to take in so much spiritous liquor as the physician thinks his patient may require. No doubt the jailer or turnkey has a right to see that this privilege be not abused.

Independent of these statutory provisions, which I consider as merely enforcing the humane principles of the common law, there are other persons who have a right to go within the walls of the jail. It is the ancient law of the land, and has never been disputed, that the coroner is to inquire into the death of all persons whomsoever, who die in prison, to the end that the public may be satisfied whether such persons came to their end by the common course of nature, or by some unlawful violence or unreasonable hardships put on them by those under whose power they were confined. 3. Inst. 52—91 : 3 Bac. 345, Tit. jail and jailer, Let. A. Sir Michael Foster, after stating the protection the law giveth to jailers, and, especially, that if a prisoner resist his authority, he may freely use force, and if the prisoner be killed, it is justifiable homicide. Whereas, if the jailer, or any one coming in his aid, be killed, it is murder in all persons joining in such resistance ; goes on to say, that, " in re- " gard to the great power these officers have, and while it " is exercised with moderation, ought to have, over their "prisoners, the law watcheth with a jealous eye over *their* "conduct; and therefore, if a prisoner under their care " dieth, whether by disease, or accident, the coroner, upon " notice of such death, *which notice the jailer is obliged* "*to give in due time*, ought to resort to the jail, and *there* " upon view of the body, *make inquisition* into the cause " of the death ; and if the death was owing to cruel and

" oppressive usage on the part of the jailer, or any offi-cer of his ; or, to speak in the language of the law, to " *duress of imprisonment*, it will be deemed wilful murder in the person guilty of such duress." Foster's Crown Law, p. 320, § 25. The instances of oppression, adds this great lawyer and friend of humanity, and of civil liberty, *which may fall within the rule of duress of imprisonment*, are as various as a heart cruelly bent upon mischief can invent. Two cases he mentions, which had come in judgment. In one a prisoner not having had the small-pox, was confined in a room *against his will* with a person who had it, the jailer knowing the fact. He caught it and died. This was held to be murder. Another prisoner was strictly confined in a low, damp, and unwholesome room, and contracted thereby an ill habit of body which brought on a distemper of which he died. This, likewise, was very rightly holden to be murder in the party guilty *of this duress.* These, says he, were deliberate acts of cruelty, and enormous violations of the trusts the law reposes in its ministers of justice.

Having shown by authority which cannot be questioned, that where a prisoner dieth in jail, it is the duty of the coroner to ascertain whether there hath been, on the part of the jailer, *duress of imprisonment;* and for that purpose, the law saith " he shall resort to the jail, and *there,* upon view *make inquisition.*" It follows, as a necessary consequence, that he hath a legal right to enter the jail, and, moreover, to convene a *jury* in the jail, and *there make inquisition.* The danger of escape from such a proceeding, must be much greater than can arise from a counsel entering the walls of a prison. But public policy remains to be examined, whether as cogent reasons exist

for the admission of counsel as for the admisssion of the coroner and his inquest.

The principle that guarantees to every man a right to defend himself by counsel, depends upon no speculative reasoning, or artificial theories. The necessity of it at once convinces the judgment, and its humanity and equity control the heart.

Its importance has been universally felt and universally admitted. It is a right inseparably connected with all free governments, and cannot be impaired without impairing the safety of the citizen. The 34th Article of the Constitution of our State, has therefore provided, " That in every trial on impeachment, or indictment for " crimes, or misdemeanors, the party impeached or in- " dicted, shall be allowed counsel *as in civil actions.*" Upon the adoption of the Constitution of the United States, the State of New York put forth its influence, in vindication of the same principle. The Convention declared, " That in all criminal prosecutions the accused " ought to be informed of the cause and nature of his ac- " cusation. To be confronted with his accusers and the " witnesses against him. To have the means of producing " his witnesses, *and the assistance of counsel for his de-* " *fence ;*" and they declare that " the right aforsaid, can- " not be abridged or violated. Done in Poughkeepsie, " 26th of July, 1788." The States of Virginia and North Carolina, by their conventions, maintained the same senti. ment, and shortly afterwards the principle was adopted by the whole Union, and now forms a part of the Constitution of the United States Art. 6 of Amendments.

*The right to be defended by counsel, "is a right "inseparably "connected "with all free "govern-"ments, and cannot be im-paired.*

Authority so high and imposing, superadded to the na-

NEW-YORK,
July, 1815.

tural justice of the claim, would seem to preclude all further inquiry. It cannot be supposed, that a right which the American people have in so deliberate a manner engrafted in the Constitution, was intended to be *partial*, or *restricted* in its operations. They could not mean it for one class of citizens, and not for another. They could not intend that he who is at liberty, and wanted it least, should have it, whilst he who is confined in prison and wants it most, should be deprived of it. When a man is separated from his family and his friends; when his fortune, his fame, or his life is at stake; when he is shut out from the rest of the world—to deprive him of counsel is cruel, arbitrary, and unjust. And I have no hesitation in saying that if an uncontrolled power of that kind existed in any jailer, it could speedily introduce a practical despotism.

The Supreme Court of this State has expressed its opinion in the case of Mr. Stannard, the attorney of John M'Curdy. " It is ordered that the said attorney be at all " times hereafter, at seasonable hours of the day, admitted " to go in and out of the debtors' jail of the City and Coun- " ty of New York, to consult and advise the said John " M'Curdy in relation to the defence of his suit." This Court cannot suppose that the Supreme Court would have made such an order, if it had not by law possessed the power to enforce it.

My opinion, therefore, is that a counsel has a right by law, at seasonable hours of the day, to go within the walls of a jail for the purpose of advising with his client.

2. If such right exists, can it be enforced by summary means, or is the party injured driven to his action ?

There is no rule of law better established than that every NEW-YORK, July, 1815. Court of Record hath the power, by summary process, to control its own officers, and to see that its process be not abused.   Hence we find it laid down  by Hawkins, in his pleas of the crown, 3 vol. 275, § 3. Tit, Attach.    " To be " every day's practice to grant attachments against a sheriff " or bailiff, &c., for oppressive practice in the  execution of " a  writ ; as for using needless force,  violence  and  terror " in making an  arrest, or by breaking open  doors where, " by law, it is  not  justifiable, or  treating  the  persons ar- " rested basely and inhumanly."    11 Hen. 42, 43.    So  it has been  adjudged a contempt of Court in  an  attorney to use reproachful  words on delivering  a  declaration  in ejectment.    3  Hawk. 278, § 12 ; note Stra. 567.    Again in § 12,  that  learned  writer says—" It seems clear from " the general reasons of the law which gives all Courts of " Record  a  kind  of discretionary power  in  the  govern- " ment of their own officers, that  every  such  Court may " proceed by  attachment for  all kinds of oppression, or " injustice done by  them in the execution of their offices, " or *by color  of  them.*"    Is  the  jailer an  officer of the Court?    The  answer is plain—he holds Bradley by the authority of this Court, and  by that alone.    Take  that from him and he  becomes a  tresspasser.    If, then,  it be the duty of the Court to prevent all abuses of its process, the jailer must fall within its  control.    It would be con- trary to the wisdom of the law to provide for the punish- ment  of  abuses in *making the arrest* and leave, unprovided for, those abuses which take place in *continuing the arrest.* When the  person of a  man is shut up  in prison, he re- quireth  the  protecting arm of the law.    He is entitled to it.    There  is no doubt about it.    There are a series of de- cisions upon the  point, and  Hawkins, who  has collected

*Margin note: Every Court of Record hath the power, by common law, to control its own officers.*

them in his 31st §, says "it is clear that jailers are punish-"able by attachment, as all other officers are, by the Courts "to which they more immediately belong, for any gross "misbehavior in their offices, or contempt of the rules of "such Courts."

We find that this prompt means of enforcing the author-ity of our Courts, applies not only to sheriffs and jailers, ,but to jurors, attornies, counsel, and all the ministers of justice. Without this authority, abuses would go unre-dressed, and the law would fall into contempt. Its. ex-istence is essential to the very ends of justice. It is said, the party may have redress by a suit—bring that sugges-tion to the test, and see whether it be true. How is he to get access to his counsel? How is he to make his com-plaint known? The jailer will admit only whom he pleases. Suppose that difficulty overcome; all who know the course of a suit, know that months, if not years, must elapse before it can be tried; in that time the fortune of the prisoner is swept away, and utter ruin overtakes him. Apply the argument to a criminal case. The keeper of the prison refuses admittance to counsel. The only reme-dy is by a suit. The attorney-general will not delay. Public justice moves on, and the unfortunate prisoner falls, deprived of the benefit of counsel. But he may have re-dress by a suit! Redress by a suit? when his fame, his liberty, or his life, is gone! To tell him so, is to insult his feelings, and mock his judgment. It is to impeach the wisdom of the law and to bring into contempt the con-stitution of our country. I feel persuaded that no good man would wish that the great right of having counsel should hang on such a tenure. The opinion of the Court, therefore, is that a counsel has a right, by law, at season-

able hours of the day, to go within the walls of a jail, for the purpose of advising with his client, and that the exer-cise of the right may be enforced by attachment.

3. The only remaining question is, whether the depositions which have been produced on the part of the sheriff and jailer, warrant the Court in refusing to interfere.

It is, no doubt in the discretion of the Court to interpose or not. But this discretion is a legal discretion, and to be used according to the due course of law. In the language of Lord Mansfield—"discretion, when applied " to a Court of Justice, means sound discretion, guided by " law. It must be governed ·by rule and not by humor ; " it must not be arbitrary, vague, and fanciful, but legal " and regular." 4 Burr, 2539. It must, according to Lord Coke, be bounded with the rules of reason, law, and justice. 5 Coke, 100; 10 Coke, 140.

I take it to be an universal principle of the law, admitting of no exception whatsoever, that a man cannot be deprived.of a known right without a specific accusation. Even where mere surety of the peace, or of good behavior, is demanded, the party requiring it must not only state his fears but assign the cause upon which those fears are grounded. The rule is laid down with great precision by Hawkins and Sir Wm. Blackstone—It is this, " that whenever a person has just cause to fear that an- " other will burn his house, or do him a corporal hurt; as " by killing, or beating him ; or that he will procure others " to do him such mischief, he may demand surety of the " peace against such person ; and every justice of peace " is bound to grant it upon the parties' giving him satis- " faction upon oath, that he is actually under such fear,

A man cannot be deprived of a known right, without a specific accusation.

NEW YORK,   " *and that he had just cause to be so by reason of the other's*
July, 1815.   " *having threatened to beat him, or lain in wait for that*
            " *purpose;* and that he does not require it out of malice,
            " or for vexation."

No cause is    In the depositions against Mr. M'Clelan, that very ma-
shown.
terial ingredient is wanting.  No cause, whatsoever, is as-
signed to the Court for the fears which the officers enter-
tain.   Without the cause being specified, how can the
Court judge whether it be a sufficient or reasonable cause?
To deprive a man of his right, or even to bind him to his
good behavior upon such a vague charge, would be in-
troducing a novelty into the law, unwarranted by any pre-
cedent, and "novelties (saith Lord Coke) without warrant
"of precedents, are not to be allowed."    By a recurrence
to the deposition of the present sheriff, it will be seen that
he knows nothing of his own knowledge, and relies whol-
ly upon the information derived from Mr. Fleet and Mr.
Bell.   He does not even say that his information was
given upon oath.   It is true he states that he believed the
information ; that he is actuated solely and exclusively by
considerations of public duty ; and that he fully believes,
that if Mr. M'Clelan be freely admitted within the locks
of the jail, dissatisfaction and disturbances will be created
amongst the prisoners ; the good order and proper govern-
ment of the prison endangered ; and his security, in re-
spect to the safe keeping of the prison, put at hazard ; in
which belief he is confirmed by disclosures recently made,
and given in evidence on the trial of an indictment in the
Court of Sessions against some other attorney ; but none
of those circumstances are set forth, so as to enable the
Court to judge of their sufficiency.

Mr. Fleet's deposition is still more loose ; he says he

came to a conclusion to refuse admittance to Mr. M'Cle- <span>NEW-YORK,</span>
lan and one other attorney; he says he formed his deter- <span>July, 1815.</span>
mination upon information which he then, and still be-
lieves to be true, but he does not state whom he derived
such information from, whether it was given upon oath or
not, nor the nature of the information.

We now proceed to the deposition of Mr. Bell. He
states that he hath kept the jail upwards of two years;
that in consequence of the occurrences which took
place, and of information received by him and Mr.
Fleet, they considered it necessary, for the good order
and government of the jail, and the safe keeping of the
prisoners, to refuse Mr. M'Clelan and one other attorney
of this Court (without naming him) admittance within
the jail. He neither states that the occurrences were,
nor the nature of the information which led to this deci-
sion. He neither gives the name of his informant, nor
whether the information was an oath. He says that the
propriety and necessity of such resolution has, in repeat-
ed instances, since the same was formed, and in various
ways, been manifested and confirmed. But he neither
gives any of the instances; nor of all the various ways,
does he specify one. He says, indeed, that he believes
that if the regulation agreed upon by him and Mr. Fleet
had not been enforced, there would have been great dan-
ger of attempts to liberate the prisoners, or to aid them,
or some of them, in effecting their escape. But not the
name of a single prisoner is given, nor a single fact to jus-
tify the Court to impute guilt to Mr. M'Clelan. He says,
that in the belief which he entertains, he has, from time
to time, been additionally confirmed, not only by a train of
circumstances which have come to his knowledge, or been

NEW-YORK, communicated to him by others, but by the testimony of
July, 1815. witnesses recently given on a trial of indictment against
another person, by which it appeared, that a design had
been formed, and arrangements made, for attempting to
liberate the prisoners, and to which design M'Clelan was
privy, if not a party thereto. Here again he states no one
circumstance upon which he relies, nor any fact which im-
plicates Mr. M'Clelan. He swears, indeed, that he is sat-
isfied that Bradley knew that Mr. M'Clelan was not admit-
ted into the jail, and that the employment of Mr. M'Clelan
is not bona fide, but merely with an intent to get admit-
tance. But he assigns no reason for this belief, nor any
cause why Bradley should not choose his own counsel.—
In fact, it cannot be disputed, that a man has a legal right
to confide his interests to any lawyer he pleases. He will
select for himself the counsel, in whose, activity, diligence,
or talents, he has the most confidence ; and it can never
be in the power of a jailer to control his choice.

If Mr. M'Clelan and any one prisoner, or any other per-
son, have conspired together to effect an escape, it is a
high misdemeanor; and upon conviction, the punishment
would be very penal. He would be liable to fine, impris-
onment, and removal from the office of an attorney. In
case of an escape, he would be subject to an action at the
suit 'of the sheriff, and to all the consequences I have
stated. Every person concerned in any plan to effect an
escape, is subject to be indicted and punished. If an at-
tempt be made by force to break the jail, the sheriff can
command the whole power of the country to put down the
attempt. The walls and bars of the prison would seem
to defy any such thing. The jail is in the centre of the
city. In the day time there are a thousand eyes upon it.

In the night it is strongly secured, and under the guard of NEW-YORK,
the watch.

If any proof can be brought before the Court, that Mr. On proof
M'Clelan meditates a project for the escape of any prison- by the court,
that a coun-
er in jail—bring the facts before the Court, and if he be sellor, or at-
guilty, he shall be removed as a member of the bar. As torney, "me-
ditates a pro-
the case now appears to the Court, he hath been deprived ject for the es-
cape of a pris-
of the privilege of entering the jail, upon information oner in jail,"
given by unknown persons. It does not appear that they he will be "re-
moved as a
were sworn. The facts which they have stated are not member of the
bar.
laid before the Court. The party whose rights have been
taken away, is reproached with an indictable offence ; he
is deprived of a privilege important to his standing as a
member of the bar, to his family, his character, and his
pursuits in life. This is done without his knowing his ac-
cusers, or being heard in his defence. Let any man ask
himself, whether this be just ? Whether he would think
the measure just if applied to himself? Whether the laws
of a free community ought to tolerate such manifest wrong
and oppression ? The opinion of the Court is, that the
depositions which have been produced on the part of the
sheriff, and jailer, do not justify the Court in refusing to
grant relief to Mr. M'Clelan and his client ; and, therefore,
the Court makes the following order.

"On reading and filing an affidavit of William W.
" M'Clelan, one of the attornies of this Court, with a let-
" ter of the defendant, addressed to his said attorney, re-
" questing him to call and see him for the purpose of aid-
" ing the defendant with his professional services. And
" the said Zenos Meigs Bradley having also, by his attor-
" ney, moved this Court for a supersedeas in the above

" cause—On motion of Mr. Sampson of counsel for the " said defendant, it is ordered, that the said William W. " M'Clelan, attorney for the said defendant in the above " entitled suit, be at all times hereafter, at seasonable hours " of the day, admitted to go in and out of the Debtors' " Jail of the City and County of New York, to consult " with and advise the said Zenos Meigs Bradley in re- " lation to the said suit, or any other suit now pending in " this court, if any there be ; and that Ruggles Hubbard, " Esquire, sheriff of the said City, James L. Bell, the jail- " er or keeper of the said jail, the turnkeys of the said jail, " or any other person whomsoever, do not deny, or in any " way obstruct the said William W. M'Clelan from so, as " aforesaid, going in and out of the said jail."

W. SAMPSON, *for Mr. M'Clelan.*
KING, *for Bell, the Jailer.*
P. W. RADCLIFF, *for Sheriff.*